COURT HOLDING COMPANY, A FLORIDA CORPORATION, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 111075. Promulgated August 9, 1943.

*Maurice Kay, Esq.,* for the petitioner.
*F. L. Van Haaften, Esq.,* for the respondent.

OPINION.

DISNEY, *Judge:* We consider first the question whether the petitioner is entitled to a deduction from gross income for 1939 for the $350 paid to Regina Feiwish and designated by the petitioner as rent discount. The grounds upon which the deduction was disallowed are not stated in the deficiency notice, and the respondent's brief contains no argument on this issue. In our opinion the amount in question constituted interest paid on an indebtedness of the petitioner, and is deductible. It is true that the promissory notes representing the Feiwish loan were made by Louis Miller, individually, but it is not disputed that the loan was made to the petitioner or that it was repaid by the petitioner. That payment of the indebtedness of another was made by the petitioner as a volunteer can not be assumed. The evidence shows also that the $350 was paid as compensation for the use of borrowed money, although denominated as rent discount. It falls within the ordinary and accepted definition of "interest," and it is in the ordinary and accepted sense that that term is used in the revenue acts. *Old Colony Railroad Co.* v. *Commissioner,* 284 U. S. 552. That the amount was prepaid and that it was paid in a lump sum rather than computed at a particular rate are facts which do not necessarily alter its character as interest. *John D. Fackler,* 39 B. T. A. 395; *Kena, Inc.,* 44 B. T. A. 217. The petitioner's accountant testified that its returns were made on an accrual basis of accounting. If that were so, it may be that the sum in question, constituting a bonus charged for making the loan, would have to be amortized over the life of the loan, and would not be deductible in full in 1939, since the notes did not mature until after the close of the year. See *Julia Stow Lovejoy,* 18 B. T. A. 1179, and *S. & L. Building Corporation,* 19 B. T. A. 788, 794. However, that question need not be decided. The petitioner had no books of account and maintained no records of any substantial nature until after the close of the taxable years, when books were prepared from such information as was then available. Under such circumstances we hold it was not on an accrual basis. *John A. Brander,* 3 B. T. A. 231; *Mansuss Realty Co., Inc.,* 1 T. C. 932. The testimony of the accountant to the contrary can not be followed. The situation here then is entirely parallel with that involved in *John D. Fackler, supra,* which held that a taxpayer on the cash basis is entitled to deduct prepaid interest in the year of payment. On this issue we hold for the petitioner.

The respondent has determined that the petitioner is taxable with the profit realized on the sale of the Mayfield Court Apartments to Margaret W. Fine. The petitioner contends that the sale was made by its stockholders individually after the property had been distributed to them in complete liquidation, and that therefore the petitioner realized no taxable gain on the sale.

In our opinion, the respondent must be sustained. When Louis Miller orally agreed with the Fines upon a price and the terms of sale of the petitioner's property, the property was still owned by the petitioner. Since there is no evidence that a distribution in liquidation was contemplated at that time, and since petitioner's officers subsequently presented themselves for the purpose of executing a writing embodying the terms of the oral agreement, we think it must be said that Louis Miller was acting in the petitioner's behalf in making the agreement, and that his action was subsequently ratified by the petitioner. Cf. *Trippett* v. *Commissioner*, 118 Fed. (2d) 764. Moreover we think that the petitioner received payment of $1,000 on account of the agreed purchase price. A statement by Minnie Miller is to the effect that all payments made by the Fines or Feiwishes subsequent to October 1, 1939, were applied on the purchase price and not rent. It is not clear whether or not the statement purports to include amounts paid by application of the promissory notes representing the indebtedness to Regina Feiwish. But even if those amounts be eliminated from consideration, it is apparent that the statement can not be entirely accurate. The evidence establishes that between October 1 and December 31, 1939, Aaron Feiwish made payments to the Millers aggregating not less than $3,600; that an additional payment of $1,000 was made January 5, 1940; that the purchase price of the property was $54,500; that $53,500 remained unpaid on February 26, 1940; and that that amount was paid subsequent to February 26 partly in cash, partly by the assumption of existing mortgages, and partly by the execution of a new note and mortgage. Thus payments made during 1939 could not have been on account of purchase price. It is also apparent, however, that $1,000 was paid on the purchase price at some time prior to February 26, 1940, and the only payment of that amount shown to have been made subsequent to January 1 was that of January 5. We conclude and have found as a fact that that payment was so applied. The inaccuracy of Minnie Miller's statement so far as it concerns payments made in 1939 may have resulted from confusion in her mind between the close of the first year of the term under the lease and the close of the calendar year 1939. However, we need not speculate as to the explanation. We are satisfied that the January 5, 1940, payment was applied on purchase price.

The facts then may be narrowed down to this: The petitioner

having entered into an oral contract to sell its property, and having received payment of part of the agreed price, at the last moment, and admittedly for the sole purpose of avoiding taxes, distributed the property to its stockholders, who promptly thereupon bound themselves in writing to perform individually the act which they had theretofore agreed to perform as a corporation. Under such circumstances we think it must be said that the Millers were carrying out the agreement made by the corporation and not an agreement made by themselves individually. There is no evidence of any further negotiation between them and the purchaser subsequent to the meeting of February 22. On the contrary, it affirmatively appears that no intercourse took place until the contract was signed on February 26. The fair inference is that it was always intended and understood by the parties that the sale would be made exactly as agreed by the petitioner, except for the change in identity of the vendor. Acquisition of good title, regardless of the vendor's identity, was obviously the only concern of the purchaser, and the transfer of title and receipt of the purchase price were the prime concern of the Millers. Consummation of the oral agreement was the substantive purpose. The resolutions of February 23 and the consequent transfer of title to the Millers were unnecessary to its accomplishment, or to the accomplishment of any purpose save that of tax avoidance. They were formal devices to which resort was had only in the attempt to make the transaction appear to be other than what it was. As such, they may not be given effect. *Gregory* v. *Helvering*, 293 U. S. 465; *Minnesota Tea Co.* v. *Helvering*, 302 U. S. 609; *Griffiths* v. *Helvering*, 308 U. S. 355. It follows that the contract of February 26 and the transfer of April 1, 1940, were the contract and transfer of the petitioner, executed for it by its stockholders as its agents, and were not the contract and transfer of the stockholders individually. Cf. *MacQueen Co.* v. *Commissioner*, 67 Fed. (2d) 857; *Hellebush* v. *Commissioner*, 65 Fed. (2d) 902; *Trippett* v. *Commissioner, supra; Embry Realty Co.* v. *Glenn*, 116 Fed. (2d) 682; *Liberty Service Corporation*, 28 B.T.A. 1067; affd., 77 Fed. (2d) 94.

Under the view we have taken it is unimportant that the petitioner itself never executed a written contract to sell. Under the Florida statute of frauds no action could have been brought on the oral agreement (Comp. Gen. Laws of Florida, 1927, vol. 3, § 5779), and apparently partial payment of the purchase price is not alone sufficient to avoid the effect of the statute. See *Williams* v. *Bailey*, 69 Fla. 225; 67 So. 877; *Maloy* v. *Boyett*, 53 Fla. 956; 43 So. 243; *Fireman's Fund Insurance Co. of San Francisco* v. *Cravey*, 101 Fla. 155; 134 So. 232. Had a writing been signed, there could be no doubt that the subsequent distribution to the Millers would be ineffective to avoid

the taxing of the profit on the sale to the petitioner. *Hellebush* v. *Commissioner, supra; Nace Realty Co.*, 28 B. T. A. 467; affirmed without written opinion April 13, 1935 (C. C. A., 6th Cir.). But, as we have said, the contract which was executed and the sale which was consummated were in substance the petitioner's contract and sale. Thus any question as to the effect of the statute of frauds is avoided, since the oral agreement was fully executed and performed. It has frequently been held that acts by the sole stockholder of a corporation are valid and binding on the corporation, though not formally authorized. See, e. g., *Pacific State Bank* v. *Coats*, 205 Fed. 618; *Rent-A-Car Co.* v. *Globe & Rutgers Fire Insurance Co.*, 156 Atl. 847; *Bankers Trust Co.* v. *Economy Coal Co.*, 276 N. W. 16; *Vawter* v. *Rogue River Valley Canning Co.*, 262 Pac. 851. Minnie Miller was the only stockholder other than Louis Miller. We think that he made the agreement with her consent and that she ratified his acts. We have above held, as contended by the petitioner, with reference to the $350 interest item, that, though the notes were made by Louis Miller individually, the loan was to the corporation. We think he was acting also for the corporation in this matter of sale. In *James Duggan*, 18 B. T. A. 608, a corporation through one of its officers entered into an oral contract to sell all its assets, including real property. Thereafter, the stockholders adopted a resolution that the assets be distributed to them in kind, appointing one of their number to receive the titles. Deeds and bills of sale were executed in favor of the appointee, the stockholders individually entering into a written contract with the purchaser for the sale of the assets. The nominee stockholder then conveyed the assets to the purchaser and received payment of the purchase price. It was held that the sale was a sale by the corporation in accordance with its prior verbal agreement, and that the profit thereon was taxable to it. The following excerpt from the opinion is apposite here:

Inasmuch as the sales agreement was executed and the property transferred with title satisfactory to the purchaser, we are of the opinion that it must be regarded as nothing less than a contract for and on behalf of the corporation, entered into for the purposes of binding these stockholders to see that the verbal agreement, theretofore made by the corporation, to sell these properties, would be carried out. The logic of the events, following the conclusion of these negotiations, as well as the things undertaken to be performed in this contract, justify such conclusion, since these directors could not have legally bound the corporation in a contract for the sale of all of its capital assets without special authority from the stockholders. The stockholders, however, could be personally bound by such a contract which, when joined in by all of them, would afford the purchaser the extreme limit of protection to be legally had in the conditions. Under such circumstances a contract by all of the stockholders, they possessing among themselves the power to force its adoption by the corporation, becomes for all intents and purposes the contract of the corporation.

The *Duggan* case presented a situation closely parallel to the one we have here. In our opinion it is dispositive of the issue. See also *Liberty Service Corporation*, 28 B. T. A. 1067; affd., 77 Fed. (2d) 94.

The case of *Falcon Co.*, 41 B. T. A. 1128; affd., 127 Fed. (2d') 277, relied upon by the petitioner, is distinguishable. There the Falcon Co. received an offer for the sale of its undivided interests in certain oil leases. As to a part of the leases, one of Falcon Co.'s coowners, here called East Texas, had an option to purchase at any price offered by a third party and which Falcon Co. should desire to accept. As to the other leases, East Texas had no such option. On receipt of the offer, Falcon Co. notified East Texas of its right under the option to purchase within 15 days of notice. East Texas would not definitely contract to purchase and made no offer to the Falcon Co. Falcon Co., principally because of the amount of taxes involved in a sale, definitely decided not to sell the properties to anyone. Thereafter, pursuant to resolutions, the assets were distributed to petitioner's stockholders as a partial liquidating dividend. East Texas immediately made an offer to purchase the interests of the stockholders in all the leases at the price previously bid by the third party. The offer was conditioned upon the execution of a formal contract satisfactory to all parties. Such contract was subsequently made, and the sale was consummated pursuant thereto. It was held that the sale was a sale by the stockholders, and the profit thereon taxable to them. The distinguishing feature of the case is that no contract was ever entered into prior to the distribution to the stockholders. It is true that the coowner with the petitioner had an option to meet any price offered by an outside party, but this was contingent upon Falcon's willingness to sell for such price, which it definitely decided not to do, and East Texas had indicated that it declined to so contract, and took no action until after the assets passed out of the petitioner's hands. Moreover, the option covered only a part of the leases finally purchased by East Texas. Thus the contract entered into by the stockholders could not be held to be referable to any prior commitment by their corporation. In the instant case not only had such a commitment been made, but part of the agreed purchase price had been paid.

We think it well, also, to discuss briefly the effect here of our decision in *Clara M. Tully Trust*, 1 T. C. 611. There the respondent sought to treat a sale of stock by an outside party to the issuing corporation as in substance a transfer by the former owners of the stock, and to tax the proceeds of the sale as a distribution in partial liquidation. The former owners, through an agent, sold their stock to a dealer in securities at a price of one hundred and one-half. The dealer on the same day resold the stock to the issuing corporation, at

one hundred and one. We held that the sale to the dealer was a bona fide and unrestricted sale, the purchaser being bound by no commitment and being free to do with its purchase whatever it wished. The gain on the sale by the stockholders was accordingly held to be taxable under the capital gains provisions. The questioned transaction was, under the facts of that case, found to be what it purported to be on its face, namely, a bona fide sale. The decision has no application in the situation presently before us, since, under the facts of this case, we have found that the distribution to stockholders was in fact subject to the petitioner's prior agreement to sell and the sale, although in form by the stockholders, was in reality in performance of the prior agreement.

We hold that the respondent properly determined that the gain on the sale of the apartment property is taxable to the petitioner. In computing the gain for entry of decision under Rule 50, none of the payments made to the Millers prior to January 1, 1940, should be considered as amounts realized as part of the purchase price.

There remain the issues arising out of the determination of the delinquency and fraud penalties for 1940, no issue having been raised with respect to the 5 percent delinquency penalty determined for 1939. Upon brief the respondent admits that the 1940 return was filed prior to the expiration of an extension of time granted by the collector, but contends that because of its inaccuracy and since it was not sworn to it can not be considered a return for the purpose of the imposition of the delinquency penalty of 25 percent. *Robert A. Burns*, 47 B. T. A. 34, supports his position and we hold that the failure to make return under oath requires the addition of the 25 percent penalty prescribed by section 291 of the Internal Revenue Code. See also *Estate of Frederick L. Flinchbaugh*, 1 T. C. 653. The respondent's answer alleges that the petitioner's failure to report as income the taxable profit on the real estate sale was fraudulent and with intent to evade tax. The petitioner filed a reply denying fraud and averring that the loss reported on its return was correct to the best of its knowledge and belief. We think the respondent has not sustained the burden of proving a fraudulent intent. We have concluded that the sale of the petitioner's property was in substance a sale by the petitioner, and that the liquidating dividend to stockholders had no purpose other than that of tax avoidance. But the attempt to avoid tax does not necessarily establish fraud. It is a settled principle that a taxpayer may diminish his liability by any means which the law permits. *United States* v. *Isham*, 17 Wall. 496; *Gregory v. Helvering, supra; Chisholm* v. *Commissioner*, 79 Fed. (2d) 14. If the petitioner here was of the opinion that the method by which it attempted to effect the sale in question was legally sufficient to avoid the imposition of tax upon it,

its adoption of that method is not subject to censure. Petitioner took a position with respect to a question of law, the substance of which was disclosed by the statement endorsed on its return. We can not say, under the record before us, that that position was taken fraudulently. The determination of the fraud penalties is reversed.

*Decision will be entered under Rule 50.*